IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

   vs.

                              Criminal No. 24-257

MOHAMAD HAMAD,
         Defendant.


- - -


Transcript of proceedings on May 1, 2025 United States
District Court, Pittsburgh, Pennsylvania, before Judge
Patricia Dodge.


APPEARANCES:

   For the Government:    U.S. Attorney's Office
                            Nicole Vasquez Schmitt, Esquire
                            700 Grant Street
                            Suite 4000
                            Pittsburgh, Pennsylvania 15219

   For the Defendant:     Federal Public Defender
                            Andrew Lipson, Esquire
                            Yemi Olaiya, Esquire
                            1500 Liberty Center
                            1001 Liberty Avenue
                            Pittsburgh, Pennsylvania 15222

   Court Reporter:        Barbara Metz Loch, RMR, CRR
                            700 Grant Street
                            Suite 6260
                            Pittsburgh, Pennsylvania 15219


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                         (9:34 a.m.)
 3          THE COURT:  When we were last here, I believe that
 4   the government had concluded any evidence or testimony it
 5   wished to present; is that right?
 6          MS. VASQUEZ SCHMITT:  That's correct, Your Honor.
 7          THE COURT:  And at this point, does the defendant
 8   choose to present any evidence or testimony, other than what
 9   has already been given?
10          MS. OLAIYA:  None, Your Honor.  We would move for the
11   admission of the remainder of the exhibits, primarily, Your
12   Honor, those being letters of support for Mr. Hamad, in
13   addition to prior court-related orders in regards to this case
14   and the transcripts of the preliminary hearing that happened
15   in November that we submitted yesterday, that would be Exhibit
16   P, and Exhibit N, being a figure in regards to release, so we
17   would just ask for the remainder of those exhibits to be
18   admitted.
19          THE COURT:  Is there any objection?
20          MS. VASQUEZ SCHMITT:  No, Your Honor.
21          THE COURT:  All right then.  All of those exhibits
22   are admitted, and that would be Exhibits A through P.
23          MS. OLAIYA:  That's correct.  Thank you, Your Honor.
24          THE COURT:  Then I believe at this point, we are
25   prepared to proceed with argument, and I look forward to
```

1    hearing from counsel.  So, Ms. Vasquez Schmitt, let's start

2    with you.

3            MS. VASQUEZ SCHMITT:  Thank you, Your Honor.  This

4    defendant, Mohamad Hamad, should be detained pretrial.  The

5    district court judge assigned to this case, Judge Wiegand,

6    already held that he was a danger to the community and a

7    flight risk when she denied the defendant's motion to remove

8    his home detention.  This was docket No. 79.  I don't know if

9    Your Honor has seen it, but I'm going to pass up a copy.

10            THE COURT:  I have, but thank you.

11            MS. VASQUEZ SCHMITT:  Your Honor, Judge Wiegand held,

12   and I have some of the language highlighted there in that

13   docket entry, that the defendant does present a risk of flight

14   and danger to the community based on the evidence she had

15   seen, which is some of the same evidence Your Honor heard on

16   Tuesday, and Your Honor had the benefit of hearing even more.

17            Judge Wiegand continued the defendant's home

18   detention, but at the time, there was no pending request for

19   detention by the government.  Judge Wiegand could not do any

20   more, but this court can, Your Honor.  This court can protect

21   the community and assure the defendant's appearance at trial

22   by detaining him.

23            Regarding flight, which the government must only

24   prove by a preponderance of the evidence, this court saw the

25   defendant has bragged about his ability to evade law

enforcement and sneak out.  He also said explicitly that he
wanted to travel overseas and fight.  He gave inconsistent
information during his background investigation about whether
he had a Lebanese passport.

The FBI, as the testimony revealed, would only be
able to tell if he traveled internationally on a passport, not
whether one existed at all in the first place.

The defendant also has numerous foreign contacts
which he also initially lied about during his background
investigation.  These facts establish by a preponderance of
the evidence that the defendant is a flight risk.

The Bail Reform Act also refers to the risk that the
defendant will obstruct justice or attempt to obstruct
justice.  Here, while on home detention, the defendant began
attending Micaiah Collins' father's church in February of 2025
and attended it for approximately ten weeks.

The defendant is not Christian.  He is Muslim.  If he
had been curious about Christianity, certainly he could have
attended a church in his own neighborhood, but instead, he
chose to go across town to the church where he had been seen
on surveillance with the now codefendant Micaiah Collins and
others who could be witnesses in this case.

The note on his phone from October 2024 suggest they
may have been discussing blowing the FBI surveillance and
dying standing while at that church.

1           We do not, Your Honor, as was apparent, have evidence

2    of who attended the church with the defendant in the last few

3    months.  We just found out he was going there, but it's no

4    great leap to conclude that Micaiah Collins was there.  It's

5    her father's church.  The defendant knew what he did with

6    Micaiah Collins.  He knew she was referenced in the complaint.

7    They were his messages, his conduct.  Surely he knew who he

8    detonated a device with that night.

9           Indeed, the defendant is now charged with conspiring

10   with Micaiah Collins to build bombs.  This is not someone he

11   should have been meeting with while on home detention.  The

12   time frame of his attendance at the church also lines up

13   exactly with when there were multiple posts, fliers and

14   protests regarding witnesses resisting the grand jury in this

15   case.

16          Interestingly, the defendant did not begin going to

17   the church right after his arrest.  It wasn't until February

18   when the government was subpoenaing witnesses to the grand

19   jury that he began his attendance at Micaiah Collins' father's

20   church.

21          The upshot of all this is it can allow the court to

22   conclude that the defendant may attempt to obstruct justice if

23   he is allowed to remain on bond.  He certainly did not tell

24   his probation officer whose church it was or give him all the

25   facts.  This is par for the course for the defendant who

1    believes he can one-up law enforcement.

2         The defense will argue that he didn't technically

3    violate a bond condition because that condition was struck.

4    Probation Officer Orrison testified that, in 14 years, he had

5    never seen that box unchecked that you can't have contact with

6    witnesses and victims.

7         Defense did mark newly the transcript from that

8    hearing and that transcript is telling.  It shows that it was

9    the added language forbidding the defendant from Jewish-owned

10   or affiliated locations.  That was the subject of the debate,

11   Your Honor.  There was no mention in that 100-plus page

12   transcript about whether he could have contact with witnesses

13   or victims.  It was that added language that was the subject

14   of the debate.

15        In any event, Your Honor, this court doesn't need to

16   find a bond violation in order to detain the defendant.  The

17   point the government is trying to make is that there is

18   evidence that this defendant, while on home detention, was

19   attempting to obstruct or was in fact obstructing justice by

20   meeting with potential witnesses.

21        Most importantly, Your Honor, regarding danger to the

22   community, this defendant has shared violent militant pro

23   Hamas, pro Hezbollah content, including from the October 7

24   Hamas attacks of multiple murdered individuals.  When he

25   shared these videos, he stated things like "Us Muslims never

1  surrender or back down" and "Lebanon just smoked they ass."

2  He shared a video of children being indoctrinated

3  with Hamas propaganda.  He threatened people online.  He

4  stated his desire for bullets to touch the foreheads of

5  Zionists.  He expressed a desire to fight and die as a martyr.

6  He called himself a terrorist and a Hamas operative.

7  He bragged about stealing flags and terrorizing

8  residents while dressed as a Hamas operative.  He spray

9  painted a Hamas target on to a Jewish institution.  He

10  manufactured and tested explosives, including pipe bombs and

11  explosives with shrapnel.

12  Your Honor, we don't know definitively what his plans

13  were for the explosives, but the messages with Collins and

14  Lubit are extremely concerning.  He and Lubit talked about an

15  upcoming exercise on the defendant's military base, but then

16  said don't talk about this over text, and he and Collins

17  discussed blowing up people's ankles in concrete.

18  The FBI unfortunately did not recover the explosive

19  materials in this case.  They could be hidden in his home or

20  elsewhere, which is a very dangerous situation.

21  Also, the defendant was screen shotting recipes for

22  explosives on October 30, 2024, the day of his arrest, and

23  there was a note on his phone stating that he wanted to die

24  standing rather than face serious federal charges.

25  Your Honor, the government also has concerns about

the defendant being on an extended period of home detention

with his family.  As the court heard, there have been

allegations of the defendant's violent, aggressive and

threatening behavior to his family members.  We all know there

are many reasons why domestic disputes do not always lead to a

conviction.

The police report states the defendant admitted to

the altercation with his sister.  The defendant threatened to

shoot his sister, who was 13 at the time, in the face with a

metal pellet that travels as fast as a bullet.

The report also states he pushed his mother, held a

knife to his brother's throat in the past and was generally

physically aggressive to his parents, but they didn't report

him.  His brother and sister said they were scared for their

safety and the safety of their family members based on the

defendant's conduct.  His sister is still a minor, and she

still resides at the residence.

And now he is home, not working, not attending

school.  If his behavior was escalating before, imagine the

tension and anger the defendant will be feeling now if he's

sent home.  Federal cases can be long.  An extended period of

home detention here can put his family members at risk, and

certainly, the government would oppose ever removing that

condition.

Your Honor, this is a unique situation, where a

1    defendant was initially charged with some misdemeanors and now

2    where the full nature of his conduct and dangerousness has

3    later been uncovered by the government.  It is a unique

4    situation before the court.  The court must assess the risk of

5    flight and dangerousness based on the full record before it

6    today.

7            Importantly, Your Honor, pretrial services is now

8    recommending detention.  They, out of everyone in this room,

9    know best about how the defendant behaved on bond, and yet

10   they are still recommending that he be detained today.

11           The stakes are so much higher for the defendant, now

12   that he's charged with multiple felonies.

13           He may have thought he got away with a lot of his

14   conduct and was just waiting out the misdemeanor charges, Your

15   Honor, but now he has much more incentive to flee.  Much more

16   incentive to put his plans into action to harm the community.

17           For all of those reasons, Your Honor, the court

18   should detain the defendant pretrial.  Thank you.

19           THE COURT:  Thank you very much.  I'll hear now from

20   Ms. Olaiya, please.

21           MS. OLAIYA:  Thank you, Your Honor.  Your Honor, this

22   case boils down to what the law says and what the facts are.

23           First, turning to some of the points that the

24   government made during its argument.  Number one, while Judge

25   Wiegand decided to keep Mr. Hamad on home detention, the

1   assertion that she could not have done more is simply false.

2   She could have, based on the government's assertion, requested

3   a detention hearing and had Mr. Hamad detained if she felt

4   that he was indeed a danger and that there were no conditions

5   that could be placed on him.

6       Instead, what she did was decide to keep him on home

7   detention, clearly signaling that there are conditions that

8   can be put in place and she decided to have those conditions

9   remain in place, which clearly show that there is a reasonable

10  assurance for both his appearance as well as the safety of the

11  community.

12      Secondly, Your Honor, attacking religion is wholly

13  unconstitutional on the government's part.  Where Mr. Hamad

14  decides to practice his faith, who he decides to commune with

15  under the First Amendment is protected.  There is absolutely

16  no evidence that Micaiah Collins or any other witnesses or

17  potential witnesses in this case were ever present at that

18  church.

19      Probation, Ben Orrison, did know about Mr. Hamad's

20  whereabouts.  Every single time he went to that church, he

21  called Mr. Orrison to make sure that he was aware, to make

22  sure that he had permission, and if there was any concern at

23  all, at any point in time, probation could have raised it with

24  the court, which they did not, clearly showing that there was

25  no violation and that he did not meet with witnesses.

1          What further evidences this, Your Honor, is that if

2    there was indeed an obstruction, the government could have

3    indicted it, if they believe he had been meeting with

4    witnesses or tainting, in some sort of way, evidence or

5    potential witnesses, but they never did that.

6          To the contrary, Your Honor, the government then

7    turned around and decided to indict a person who they wanted

8    to use as a witness.  Not to mention, Your Honor, just to make

9    clear, the government is also asserting that Mr. Hamad was the

10   one who spray painted a building, but their own theory of

11   their case is that it was not Mr. Hamad.  So to say that now

12   is very disingenuous during this very contentious detention

13   hearing.

14         Every alleged offense, Your Honor, took place before

15   Mr. Hamad was ever indicted.  The government asserts that, had

16   it known this information at the time of the indictment, it

17   would not have agreed to release, yet the government's own

18   witness on cross-examination could not provide a definitive

19   answer as to when these alleged aggravating factors were

20   finally discovered.

21         So we are left with what the government had and when

22   they had it.  The first search of Mr. Hamad's home took place

23   in August of last year, August 2024.  This is when the

24   government seized the phone that had the most concerning

25   information presented in this case, including alleged

1    incendiary devices and Mr. Hamad allegedly detonated them.

2          Then in November, as shown by Exhibit M, the

3    government had information from Mr. Hamad's Instagram account

4    as presented to the defense during discovery.

5          The fact remains that the government cannot say it

6    just learned about this alleged information a week ago, two

7    weeks ago or even 30 days ago.  To the contrary, in November

8    of 2024, in Exhibit B, this is on page 37 of the transcript,

9    Your Honor, from the preliminary hearing, lines 12 through

10   613, AUSA Carolyn Bloch asked Agent Brian Collins:

11         On July 7, Mr. Hamad and that individual continued to

12   have conversations.  Did the other individual send Mr. Hamad a

13   video of them undertaking the explosion of this test run?

14         Yes, the text is I keep watching the video, and then

15   individual number one sent Mr. Hamad a video clip.

16         This clearly shows, Your Honor, that the government

17   had this information and was aware of it, of the most serious

18   offenses that they are alleging today.

19         This is part of the very foundation of the

20   government's argument about why they are now seeking

21   detention.  This then means that what is true is that the

22   government had this information in their possession for almost

23   half a year while Mr. Hamad was on pretrial release.

24         Here are more facts.  We are in a unique situation

25   because, as the government mentioned, rarely does the court or

1    any of us have an opportunity to test whether there are indeed

2    any conditions of release that can be put in place that would

3    reasonably assure the person's appearance and the safety of

4    the community.  Yet we are in that exact situation today.

5         Mr. Hamad has been fully successful on pretrial

6    release.  There have been no violations of pretrial release,

7    as testified to by Ben Orrison who was directly supervising

8    Mr. Hamad.  There is no harm he has caused to anyone while on

9    release.  There have been two court ordered appearances since

10   Mr. Hamad's arrest while he was on release which he fully

11   complied with, Exhibit G being the warrant this honorable

12   court signed for Mr. Hamad's prints and DNA in February.

13         What some would feel is a complete violation of their

14   person, their bodily autonomy and in response to that, might

15   defy a court order, Mr. Hamad did what this court ordered him

16   to do.  He came to this very courthouse and fully complied in

17   giving both his DNA and fingerprints to the government.

18   Mr. Hamad has consistently done what has been required of him.

19         And while the law only requires reasonable assurance

20   and not a guarantee regarding conditions of release,

21   Mr. Hamad's behavior on pretrial release unequivocally shows

22   that conditions do exist that assure both his appearance and

23   community safety.

24         Now, Exhibit G, the original bond report in this

25   case, states that Mr. Hamad can be released on conditions.  It

14

1    also included the offense from 2022 that the government is

2    trying to use against Mr. Hamad and besmirch his character.

3    The simple truth is the charges were dismissed and cannot be

4    held against Mr. Hamad for that very reason.

5         His family is here willing and ready and happily and

6    painstakingly supporting him and wanting to see his release.

7    Ben Orrison, probation officer who is directly supervising

8    Mr. Hamad, went to his house several times, spoke with his

9    parents, met his little sister.  At any point in time if they

10   had any concern about Mr. Hamad being there, they could have

11   expressed it, and they did not.

12        To the contrary, they wanted him back home, and they

13   are here today showing their presence, stating that they want

14   him home again.

15        Now, turning to Mr. Hamad himself, his character, his

16   physical and mental condition.  After this case, Mr. Hamad

17   unfortunately developed issues with his health.  These issues

18   are ongoing and they are unknown at this time because further

19   testing is necessary.  Right before his arrest, Mr. Hamad did

20   have an appointment for the following day which obviously he

21   wasn't able to attend, but he's hoping, with these

22   appointments, to get an official diagnosis for the care he

23   will need.

24        As we know, the jail is probably unlikely to be

25   equipped to determine a diagnosis for Mr. Hamad, let alone

1    care for it over a period of time.

2            The family ties that Mr. Hamad has, again, are very

3    strong.  They're here.  They want to help him through this

4    incredibly difficult time and see him through this process

5    successfully.  Mr. Hamad lacks financial resources due to his

6    inability to work right now because of a lack of

7    transportation.

8            Where he's currently living is not like he can hop on

9    a bus or catch a ride or anything of that nature.  He does not

10   have a license right now, and so he is, for all intents and

11   purposes, confined primarily just to his home.

12           Additionally, Your Honor, he also does not have his

13   U.S. passport.  The only passport that has indeed been issued

14   to him has been turned over to the United States Probation, so

15   the risk of flight is completely mitigated, Your Honor, in

16   this case.

17           Mr. Hamad, he has lived and was raised in the greater

18   Pittsburgh community.  He has very strong community ties, as

19   evidenced by the moving letters of support.  He has the full

20   courtroom here backing him, Your Honor, for every court date

21   he had.  He has people here who love him, who care about him,

22   of all faiths, Muslim, Jewish, Christian, atheist, who all

23   want to see him succeed on pretrial release and put forth to

24   the court that, whatever they can do to augment that, they

25   will.

1        All that has changed, Your Honor, is that the

2   government has finally decided to put forth information that

3   it has been sitting on and has had in its possession since the

4   beginning of last November, at the very latest.

5        What has happened since then?  All of November

6   passed, and there's no new detention request.  All of December

7   passed.  No request for detention.  All of January passed.  No

8   request for detention.

9        February comes along.  Still no request for

10  detention, but again, Mr. Hamad comes to court, gives his DNA

11  and prints, complying with the court order, and frankly if

12  Mr. Hamad was the person that the government is trying to

13  paint him out to be, he could have fled then.  If he had the

14  capability to cause harm, he would have done so then, but he

15  didn't because that is not his character, that is not who he

16  is, and that is not who the government is trying to make him

17  out to be.

18       All of March passes, Your Honor.  Again, still no

19  request for detention.

20       As it relates to the current bond report, Your Honor,

21  Ben Orrison did not write that bond report.  He didn't

22  participate in any of the interviews.  To the contrary, Your

23  Honor, all bond reports go through, as this court knows, the

24  supervisory channel before it is presented to the court, and

25  as discussed in the report, all of their assessments are based

17

1    off of what the government is alleging.  Not who Mr. Hamad is

2    as a person.  Not because he has failed during pretrial

3    release.

4         He has been completely successful, as testified to by

5    the government's own witness.  Unfortunately, probation simply

6    does not take that into account and only goes off of the

7    offenses that the government is alleging.

8         Finally, Your Honor, what we have here at the end of

9    April, and that the government is now seeking detention, but

10   the strongest and immutable fact is that Mohamad has been on

11   pretrial release for half a year and has been fully compliant

12   with his conditions of release and none of this alleged

13   information occurred while -- before he was indicted.

14        He has family and friends from this community who

15   love him dearly and want to see him through this process and

16   continue to help him be successful on pretrial release.  To

17   detain him now would be nothing short of punitive and in utter

18   misalignment with the law.  Thank you.

19        THE COURT:  Let me ask you a couple of questions.

20   With respect to the issue of transportation, I've heard what

21   you've said.  Do you know how he has been transported back and

22   forth when he has attended religious services?

23        MS. OLAIYA:  It's been primarily his father, Your

24   Honor, who also transports him to court.

25        THE COURT:  You mentioned health issues.  I don't

1    want to pry into anything that's confidential or not yet

2    diagnosed, but I didn't hear any evidence about health issues.

3         Do you want to speak further of that?  And if it's

4    private, I understand.

5         MS. OLAIYA:  I can attest to Your Honor that Ben

6    Orrison did mention on the stand that Mr. Hamad has talked to

7    him about his ongoing health issues.  If the court would like

8    more details, we can happily approach sidebar.

9         THE COURT:  That's all right.  I don't.

10        With respect to the issue of the passport, and again,

11   to the extent that you can discuss this with me, there's been

12   conflicting evidence about whether Mr. Hamad has another

13   passport.  Do you have any information that you feel you can

14   share with me on that subject?

15        MS. OLAIYA:  Just that absolutely he does not.  He

16   does not.  I can't, unfortunately, present the negative, but

17   he does not have a Lebanese passport.  Only a U.S. passport.

18        MR. LIPSON:  One moment, Your Honor.

19        MS. VASQUEZ SCHMITT:  Your Honor, I would object to

20   her -- if she is going to offer a proffer on a fact, I would

21   ask that her client be offered for cross-examination or some

22   other witness be offered for cross-examination on that

23   proffer.

24        THE COURT:  Again, we are beyond the hearing point.

25   My question was only you indicated that he did not have it,

1    and I've not heard any evidence one way or the other.  I think

2    the evidence was that he had stated that he had one and then

3    later said that he didn't.  Is that your understanding of the

4    testimony here?

5         MS. OLAIYA:  Yes.  He conferred with his father,

6    based on the testimony, who handles the passports and was able

7    to confirm he did not have one.  Based on cross-examination,

8    asking the FBI agent whether or not he could determine if

9    there were any foreign documents, I believe he stated, that a

10   person uses to travel, he confirmed that he did look into that

11   and that there was nothing in regards to Mr. Hamad had ever

12   done traveling with foreign documents aside from a U.S.

13   passport.

14        THE COURT:  Thank you.

15        Further argument, Ms. Vasquez Schmitt?

16        MS. VASQUEZ SCHMITT:  Your Honor, just to the point

17   about Micaiah Collins, just briefly.  Probation Officer

18   Orrison testified he didn't know about the connection to the

19   church.  That's why he was approving those visits, and he

20   testified that if he -- if there was a possibility of the

21   defendant meeting with potential witnesses, he would have had

22   to dig into that much more, talk to the government, et cetera,

23   and that didn't happen in this case.

24        I want to thank Attorney Olaiya for pointing out I

25   should have said he conspired to spray paint a target for

20

destruction on a Jewish religious real property and surveilled
that institution wearing Hamas gear.

With respect to the timing of the government's
knowledge, Your Honor, it's really no surprise they're
focusing on this because the evidence is so strong related to
danger of the community and flight risk.  They want to dig
into exactly what date the government knew what.

I think the testimony was Instagram came in in
November, but then Special Agent Battaglia explained there
were some technical difficulties and then a human being has to
lay eyes on things.  When there are terabytes of data, some
things can get missed.

I want to be clear that it's not that we knew
everything that was presented to the court in November, and
that's not what the evidence showed.

Your Honor, there's nothing improper about seeking
detention now that he is facing multiple felonies and now that
we have this new information.

Respectfully, the timing of when we knew it honestly
doesn't matter.  The court needs to assess the facts sitting
here today.

With respect to -- Your Honor already discussed,
there's no evidence in the record about health issues.  You
know, suddenly he needs to schedule appointments.  He's had
all these months to schedule appointments, and suddenly he

1   needs to do that now.

2           Honestly, probation considers much more than

3   allegations in the indictment.  Actually, usually in bond

4   reports, they say we don't consider the nature and

5   circumstances of the offense and the weight of the evidence.

6   In fact, they consider all of the defendant's characteristics,

7   and that's in fact what they focus on, not necessarily just

8   the government's allegations, and they are recommending

9   detention today, their office, even though Mr. Orrison wasn't

10  directly involved in that recommendation.

11          Thank you, Your Honor.

12          THE COURT:  Ms. Olaiya, anything further?

13          MS. OLAIYA:  One moment, Your Honor.  I'm sorry.  If

14  I could.

15      (Brief pause.)

16          MS. OLAIYA:  Just putting a stipulation, Your Honor,

17  that I failed to put in at the beginning of this hearing.  My

18  apologies.  There were several paragraphs that, yesterday,

19  both the government and the defense agreed came from the phone

20  that was seized from Mr. Hamad's residence on -- in August of

21  2024 and just noting it for the record.  It's paragraph 47.

22          THE COURT:  Of what document?

23          MS. OLAIYA:  I'm sorry, Your Honor.  The superseding

24  indictment.

25          THE COURT:  Thank you.

1          MS. OLAIYA:  47, Your Honor, being the stipulation

2    that it came from Instagram, and then paragraph 60, paragraph

3    65 and paragraph 67, those ones coming from the phone, Your

4    Honor.

5          MS. VASQUEZ SCHMITT:  Your Honor, we don't have a

6    problem stipulating to that.  We discussed with counsel if

7    they would also stipulate that we didn't know about any of

8    those paragraphs at the time of his initial arrest on October

9    30, 2024.

10          THE COURT:  All right.  Anything further, counsel?

11          MS. OLAIYA:  Just confirming, Your Honor, that it's

12    60, 65, 67 and 70 from the phone and as the government pointed

13    out 47 from the Instagram.

14          THE COURT:  Thank you.  At this point, I'm going to

15    turn to my findings and conclusions in connection with the

16    government's request for detention.  As indicated throughout

17    this process, the government has requested detention and

18    requested to detain Mr. Hamad pending the trial in this matter

19    on several bases.

20          First, that he represents a danger to others in the

21    community and that he is a flight risk.  Also it was argued

22    today and in the request for detention that there is a risk

23    that Mr. Hamad will obstruct or attempt to obstruct justice,

24    and certainly that's why we are here today.

25          I will also note that we are here on a superseding

1    indictment that was issued by the grand jury in April of this

2    year.  That includes nine counts, some of which were alleged

3    in the previous indictment, some of which were not, so we are

4    addressing those nine counts here today.

5           As the parties know, I'm required to consider the

6    four specific factors in the Bail Reform Act in order to make

7    a determination about detention, and I'm going to go through

8    those now.

9           And I will review some of the testimony and evidence,

10   not all of it, but I have considered all of it, including all

11   of the exhibits introduced by both the government and

12   Mr. Hamad as well as the testimony of Officer Orrison and FBI

13   Agent Battaglia.

14          The first of those factors that I must consider is

15   the nature and circumstances of the alleged offenses.  And in

16   summary fashion, I'm going to review some of the evidence with

17   respect to the nature and circumstances.  We know, for

18   example, that at some point in time, Mr. Hamad determined that

19   he wanted to become a member of the Pennsylvania Air National

20   Guard.

21          According to the indictment, he presented false

22   information to the government during interviews regarding his

23   ultimate allegiance to the United States.  There is a fair

24   amount of evidence that suggests that, in statements

25   otherwise, he indicated that the country of Lebanon and

1  Palestine were number one in his consideration, that he joined

2  the Air National Guard in order to learn combat skills.

3       At one point, referred to himself as a Hamas

4  terrorist.  Shared pro Hamas videos, content and propaganda,

5  and at one point stated, "Let America kiss my ass."

6       Therefore, I view those to be serious allegations

7  regarding dishonesty to the government about his allegiance to

8  the United States.

9       We also know that, with respect to the nature and

10  circumstances, Mr. Hamad allegedly was part of a conspiracy to

11  deface Jewish religious property, and in one such instance, a

12  spray paint of -- an inverted triangle was spray painted at

13  the Chabad.  That, at least according to the testimony I

14  heard, represents that location would be a target.

15       We also know, based upon the allegations in

16  the indictment, that at various points, Mr. Hamad manufactured

17  and detonated explosives.  The current location of anything he

18  may have ordered under a pseudonym are not known at this time.

19       We also know that he at least stated that he was

20  stealing Israeli flags and that he understood that might

21  create terror if individuals at the homes where that was

22  located would create terror if they saw how he was dressed.

23       He has also referred to himself as a Hamas operative

24  and indicated that Jews are the enemy.

25       So I certainly view the circumstances and the nature

1    of the offenses with which Mr. Hamad has been charged,

2    understanding he's entitled to the presumption of innocence,

3    are serious.

4         In terms of the weight of the evidence, certainly we

5    know that a federal grand jury has returned an indictment

6    which reflects that the grand jury viewed that there was

7    probable cause to indict Mr. Hamad on the nine counts with

8    which he has been charged, and I view otherwise the weight

9    here to be strong based upon the testimony of FBI Agent

10   Battaglia regarding the investigation that was conducted in

11   connection with the charges against him, and I'll get back to

12   some of the timing of that at a later point.

13        With respect to the history and characteristics,

14   which is the third factor I'm required to consider, I'm basing

15   that, in part, on testimony provided during the hearing, in

16   part, on the pretrial services report and other evidence that

17   was submitted, and let me summarize what some of that evidence

18   revealed.

19        Mr. Hamad does have ties to this area.  He was born

20   in Ohio.  He resides with his parents and his minor sister in

21   Coraopolis, Pennsylvania.  He is unemployed, single and does

22   not -- it does not appear that he has had any employment other

23   than his time with the Air National Guard, which apparently

24   has been suspended based upon the investigation in terms of

25   some of his actions and statements.

1       He is a dual citizen of the United States and

2   Lebanon.  He may or may not have a Lebanese passport.  I'm not

3   basing any of my findings specifically on that, because I

4   don't think we have any evidence to the effect that he does

5   have one.  He does have ties both here to the United States

6   and to Lebanon.

7       In terms of other history and characteristics, he

8   indicated at one point that he wanted to join the Air National

9   Guard in order to learn combat skills.  He has described

10  himself as a Hamas operative and a terrorist.  He has stated

11  at various times that he does not want to live here, that he

12  wants to die fighting, that he doesn't see himself living

13  long.  His ultimate goal is shahid, in other words martyrdom,

14  and he wants to go to Palestine.

15      He's also testified that he endorses at least the

16  statement that bullets should touch the foreheads of Zionists.

17      He has, at various points, bragged about his

18  ability -- I'm sorry, at one point bragged about his ability

19  to evade law enforcement and suggested he would delete his

20  chats in order to keep that information from the Air National

21  Guard.

22      He has manufactured and tested explosives, and while

23  professing that he wants to engage in the fight overseas, he

24  has not confined his actions to going to Palestine.  He has in

25  fact been charged at least with defacing Jewish religious

property, stole Israeli flags and, as I mentioned previously,

manufactured explosives and detonated explosives in this

country for a purpose, at least at this point, unknown.

I certainly acknowledge and agree that he has

complied with the conditions of his pretrial release.  There's

no evidence otherwise.  He has attended the Valley View

Presbyterian Church since February at least ten times.

Certainly it is well within his prerogative to do so, as he

has the right to exercise his religion.

I will note, however, that despite not being able to

get transportation to seek any employment, he has been able to

be transported all ten times, apparently, to that church, and

I will note that the father of one of his codefendants is the

pastor at that church.

Again, that does not mean that he cannot attend that

church, but I do find the timing of beginning to attend that

in conjunction with the request to modify his conditions of

release to be interesting.

He does not have an extensive criminal history.  I

have reviewed the police report that was submitted as Exhibit

1 by the government.  Obviously, there were no charges

assessed there.  There is some concern in my mind about

threats of violence, but there has been, as indicated, no

conviction with respect to that.

I am also concerned about the testimony of FBI agent

1    Battaglia about Mr. Hamad's conduct when he was arrested on

2    the most recent indictment.  In other words, refusing to come

3    downstairs for some point and engaging in language that would

4    not be appropriate, in my view, under the circumstances.

5         So I have considered all of that.  I've also

6    considered what the -- what Mr. Hamad has submitted as

7    character references, and I have reviewed all of those, and

8    certainly, there is no question that he has the support of

9    friends and colleagues who remain willing to assist him, and

10   certainly I appreciate their communications to me about that

11   and have taken that into consideration.

12        I've also considered the entire pretrial services

13   report, including its recommendation that Mr. Hamad should be

14   detained.  I've also reviewed, prior to today, both the motion

15   to amend his conditions of pretrial release as well as the

16   government's response to that, as well as Judge Wiegand's

17   conclusion that Mr. Hamad does represent a danger to the

18   community and a flight risk.

19        I do feel that the stakes are higher now, as

20   Ms. Vasquez Schmitt indicated, than they were when Mr. Hamad

21   was placed on conditions of release previously, given the

22   nature of the offenses with which he has now been charged.  I

23   do note that many of the facts that I've heard here today were

24   presented in a prior proceeding and are not new.

25        I did hear, based upon the testimony of Agent

1    Battaglia, that there were a number of things that the FBI did

2    not know when Mr. Hamad was arrested in October of 2024.  That

3    includes the Instagram videos, some of which we've seen here

4    today that reflect violent conduct, the explosion of pipe

5    bombs in State College or near State College, the fact that

6    Mr. Hamad was looking for instructions about how to build

7    explosive devices, contents of the police report from Moon

8    Township that Mr. Hamad wanted to travel to Palestine and the

9    possibility, and I'm saying just the possibility, of a

10   Lebanese passport, again not saying there was one, I don't

11   think there's any evidence to that effect, but Agent Battaglia

12   also testified about knowledge of Lebanese friends and family

13   which would not be unusual, given Mr. Hamad's dual

14   citizenship.

15          I have also considered the nature and seriousness of

16   danger to others in the community.  I certainly don't doubt

17   that Mr. Hamad, as far as all of us know, has complied with

18   the conditions of his pretrial release.  Nonetheless, I am

19   also concerned about some of the addition evidence I've heard,

20   plus the existence of a number of other charges in the

21   indictment.

22          Walking through the risk of flight, I note that, as I

23   mentioned earlier, there appears to me to be more incentive

24   now to flee based upon additional charges, and Mr. Hamad, at

25   one point at least, has bragged about his ability to evade law

1    enforcement, and certainly we know that, with that heightened

2    incentive, there may be a further incentive to avoid the

3    charges here.

4          With respect to the government's allegation to

5    obstruct justice, all I'll note about that is that I do find

6    it interesting that, while Mr. Hamad may certainly observe any

7    religion freely that he chooses to do or no religion at all,

8    the fact that he has, since February, been attending a church

9    at which his codefendant's father is the pastor, I find to be

10   somewhat interesting, and of course, we know that Defendant

11   Collins was part of what is alleged to be a conspiracy to

12   build explosive devices, and in fact, certain of those were

13   detonated, whether that was with Ms. Collins or not.

14         And I also note that there has been some evidence

15   presented about what has occurred just before Mr. Hamad's

16   indictment with respect to grand jury resistance and

17   subpoenas.

18         I've also examined the danger to the community.  I

19   observed Judge Wiegand's statements.  I've reviewed all of the

20   evidence here today, and despite the fact that Mr. Hamad has

21   reflected, as far as I know, compliance with the conditions of

22   pretrial release, I do find, by clear and convincing evidence,

23   that there are no conditions or combination of conditions that

24   will reasonably assure the safety of others based upon

25   Mr. Hamad's actions, Mr. Hamad's statements, Mr. Hamad's

1    professed allegiance to Hamas, terroristic activities and

2    engaging in conduct that seems to suggest that that will

3    continue if he is released on conditions.

4            I'll note that being on home detention simply means

5    that.  In the event someone does not comply with those terms,

6    eventually that will be known, but there is no instant

7    notification that someone is evading the terms of their home

8    detention.

9            So based upon all of those matters, the finding of

10   Judge Wiegand and the testimony here about Mr. Hamad's

11   professed allegiances and conduct, I am finding, by clear and

12   convincing evidence, that there are no conditions that will

13   reasonably assure the others based upon the new charges.

14           With respect to risk of flight, I'm not finding there

15   is a significant risk of flight here, simply because I don't

16   have enough evidence to suggest that Mr. Hamad has the

17   resources or the ability to flee, even though I will note that

18   there is likely to be a heightened urgency about his current

19   status based upon the addition of new charges.

20           I will issue an order to that effect after this

21   proceeding here today.

22           Ms. Vasquez Schmitt, is there anything further that

23   you wanted to address?

24           MS. VASQUEZ SCHMITT:  No.  Thank you, Your Honor.

25           THE COURT:  Ms. Olaiya, Mr. Lipson, anything further?

32

1          MS. OLAIYA:  Nothing, Your Honor.

2          THE COURT:  That concludes our proceeding.  Thank

3   you.

4      (At 10:22 a.m., the proceedings were adjourned.)

5                  C E R T I F I C A T E

6          I, BARBARA METZ LOCH, RMR, CRR, certify that the
    foregoing is a correct transcript from the record of
7   proceedings in the above-entitled case.

8


9   _\s\ Barbara Metz Loch_          May 19, 2025_
    BARBARA METZ LOCH, RMR, CRR     Date of Certification
10  Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25